NEWBY, Justice.
In this case we explore the application of section 75-1.1 of our General Statutes, the unfair and deceptive practices statute, to the consumer loan market. First, we must decide whether an action for misrepresentation under section 75-1.1 requires reliance by a borrower who accuses a lender of collecting a fee for a discounted loan without actually charging a discounted interest rate. Second, we must determine whether section 75-1.1 imposes a price ceiling on the fees a closing services provider may charge in connection with closing a loan.
Section 75-1.1 has long encompassed conduct tantamount to fraud, which requires reliance, and we see no reason for departure from that requirement when the actions alleged include the misrepresentation of a loan transaction that caused injury. Even so, there are issues of material fact regarding whether the conduct proscribed by the first claim actually occurred in this case. Further, section 75-1.1 does not prescribe the amount of fees that may be charged in exchange for closing a loan transaction that was freely entered in the open market. Because the trial court improperly allowed summary judgment for plaintiffs on both claims which the Court of Appeals did not correctly reverse, we reverse the decision of the Court of Appeals.
In 1999 plaintiffs Travis Bumpers (Bumpers) and Troy Elliott (Elliott) obtained loans from defendant Community Bank of Northern Virginia (Community Bank). According to Bumpers, he received a mailed solicitation from Community Bank inviting him to apply for a loan. At that time he had credit card debt carrying a high interest rate, and he also wanted to perform some home improvements. Bumpers *83 sought a loan from Community Bank, which ultimately gave him a loan with an interest rate of 16.99%. Reasoning that this interest rate was decidedly lower than the rate on his credit card debt, Bumpers borrowed $28,450.00 from Community Bank, executing a promissory note for that principal amount, which was secured by a second deed of trust on his main residence. Bumpers completed this loan transaction without first asking about the amount of the discount he was receiving or considering whether another lender would have offered better terms, though he was aware that he was free to do so.
In connection with the issuance of the loan, Bumpers paid various fees totaling $4,827.88. Community Bank charged him a total of $3,622.88, including a $1,280.25 loan discount fee, for services associated with originating the loan,[1] and Title America, LLC, a settlement agent affiliated with Community Bank, imposed the remaining fees.[2] Bumpers stated that he “thought the fees would be a little more” because a second mortgage places more “risk” on the bank. Further, Bumpers was not concerned with the services he received in exchange for each fee; rather, he focused only on the total amount necessary to obtain the loan. And as with the loan itself, Bumpers declined to shop around for a less expensive settlement service provider, even though he was aware that he was free to do so. Bumpers paid the fees imposed, and in September 2002 he repaid his loan.
Elliott similarly obtained a loan after receiving a mailing from Community Bank. Elliott compared the interest rates of competing institutions with that available from Community Bank. Elliott then decided to obtain a loan from Community Bank because of its lower interest rate. Ultimately, Elliott agreed to borrow $35,000.00 at an interest rate of 12.99%. In connection with that loan, Elliott paid $5,650.00 in fees, including a $1,400.00 loan discount fee to Community Bank and $1,145.00 in closing fees to Title America, LLC.[3] After obtaining this loan, Elliott acknowledged, but did not exercise, his right to cancel the loan without cost.
*84 In 2001 plaintiffs, on behalf of themselves and all those similarly situated, filed a complaint in the Superior Court, Wake County, alleging in relevant part that Community Bank’s loan- transactions violated North Carolina’s unfair and deceptive practices statute. More specifically, plaintiffs asserted that they paid loan discount fees, but did not receive discounted loans. Plaintiffs also alleged that the fees they were charged in connection with origination of their loans were unnecessary and unreasonable. Plaintiffs contended that Community Bank’s conduct amounted to a violation of section 75-1.1 of our General Statutes, which prohibits “unfair or deceptive acts or practices in or affecting commerce.” N.C.G.S. § 75-1.1 (2011).
On 5 February 2008, plaintiffs moved for partial summary judgment against Community Bank.[4] Arguing in support of their motion, plaintiffs first addressed their claims regarding Community Bank’s loan discount fees.[5] They argued that the HUD-1A Settlement Statements completed in connection with their loans from Community Bank show that they paid loan discount fees in excess of $1,000.00 each — $1,280.25 for Bumpers and $1,400.00 for Elliott — in addition to other loan origination fees. Plaintiffs alleged that according to the United States Department of Housing and Urban Development, which promulgates the HUD-1A form, “the term ‘loan discount’ as used in line 802 of [the HUD-1A] ... is ‘a one-time charge imposed by the lender or broker to lower the rate at which the lender or broker would otherwise offer the loan to you.’ ” Plaintiffs stated that Mary Jo Speier, President of Title America, LLC, agreed with the federal government’s definition. Plaintiffs asserted that Community Bank did not, however, provide discounted loans, pointing to Community Bank’s loan transmittal documents which had a checked box next to the word “no” under the heading “Buydown.” Plaintiffs maintained that this checked box showed that they did not receive discounted loans. As a result, plaintiffs contended they were entitled to summary judgment on their *85 claims that Community Bank charged them for services it did not provide, in violation of section 75-1.1 of our General Statutes.
Second, plaintiffs also forecast evidence in support of their excessive pricing claims. Plaintiffs alleged that they paid over $1,000.00 each- — $1,180.00 for Bumpers and $1,145.00 for Elliott — in closing costs to Title America, LLC. They asserted, however, that during the relevant time period the average cost in North Carolina “for an attorney to handle a second mortgage loan, including title search and ‘live closing,’ ranged between $258 and $324.” Plaintiffs averred that Community Bank’s closings were quite cursory and much less involved than if conducted by attorneys. Finally, plaintiffs asserted that $400 is “the upper limit of reasonable charges for the settlement agent.” As a result, the fees charged for the closings were excessive, in violation of section 75-1.1. Plaintiffs also claimed that, though the closing fees were charged by Title America, LLC, Community Bank should be responsible because of its relationship with Title America, LLC.
Community Bank opposed plaintiffs’ motion for partial summary judgment. Community Bank argued, inter alia, that plaintiffs failed to demonstrate reliance on its alleged misrepresentations that discounted loans would be provided, which Community Bank contended is required to prevail on a misrepresentation claim under section 75-1.1. Further, Community Bank responded that a statement from its former Mortgage Operations Officer, John Grace, at least created an issue of material fact regarding whether plaintiffs actually received discounted loans. Mr. Grace’s statement explained that the box indicating that there was no “buy-down” actually does not address whether plaintiffs received discounted interest rates. Rather, that checked box referenced “whether the borrower obtained a temporary buy-down of the interest rate, a feature which was” inapplicable to second mortgage loans, including plaintiffs’. He concluded by stating that “[t]his section does not in any way address whether the borrower’s interest rate was a discounted interest rate.” Regarding plaintiffs’ excessive pricing claims, Community Bank argued that such claims were simply not actionable under section 75-1.1.
On 28 April 2008, the trial court allowed plaintiffs’ motion for partial summary judgment. First addressing the loan discount claims, the trial court determined that each plaintiff paid a loan discount fee, which is a fee to reduce a loan’s interest rate. Nonetheless, the trial court found that Community Bank’s loan documents, which had “the ‘no’ block checked under ‘Loan buydown,’ ” showed that no dis *86 counted interest rates were given. This, according to the trial court, constituted an unfair or deceptive practice under section 75-1.1. The trial court acknowledged Mr. Grace’s statement about the inapplicability of the provision, but reasoned that the statement “does not contradict the materials put forward by plaintiffs: Mr. Grace does not state that [plaintiffs] in fact received . . . ‘discounted’ or ‘bought down’ interest rate[s], but rather confirms that [plaintiffs] did not receive one sort of ‘bought down’ interest rate.’ ” As a result, the trial court determined that there was “no dispute in the evidence” that plaintiffs did not receive loans with bought down interest rates in exchange for the loan discount fees they paid.
The trial court also entered summary judgment on plaintiffs’ excessive pricing claims. The trial court found that Bumpers paid $1,180.00 and Elliott paid $1,145.00 for closing services, which was in excess of the $400 “maximum reasonable charge” for those services during the relevant time period. The trial court ultimately concluded that the various itemized fees, which collectively composed the amount paid for closing services, appeared to be redundant and duplicative and that Community Bank engaged in systematic overcharging in violation of section 75-1.1.
On 15 May 2008, the trial court entered a final order, directing Community Bank to pay Bumpers damages equal to the amount he paid for a loan discount, which with interest totaled $1,864.78, and damages in the amount of the difference between the price plaintiff paid for closing services and the maximum reasonable price, which with interest totaled $1,136.13. Using a similar computation, the trial court awarded Elliott damages of $3,243.96. Because the trial court determined Community Bank’s conduct violated section 75-1.1, the trial court trebled the award of damages under section 75-16, awarding Bumpers $9,002.72 and Elliott $9,731.88. Community Bank appealed.
The Court of Appeals affirmed in part and reversed in part the trial court’s orders on summary judgment.[6] Bumpers v. Cmty. Bank *87 of N. Va.,_N.C. App._,_, 718 S.E.2d 408, 415 (2011). First, regarding plaintiffs’ loan discount claims, the Court of Appeals agreed with Community Bank that generally a plaintiff asserting a claim under section 75-1.1 based on misrepresentation must show reliance to establish proximate cause. Id. at_, 718 S.E.2d at 413 (citation omitted). The Court of Appeals reasoned, however, that plaintiffs’ claims were not based on misrepresentations, and thus the court did not consider whether reliance was present. Id. at__, 718 S.E.2d at 413. Rather, the court viewed the claims as essentially claims for systematic overcharging based on its earlier decision in Sampson-Bladen Oil Company, v. Walters. Bumpers,_N.C. App. at_, 718 S.E.2d at 412-13. After characterizing the claims, the Court of Appeals concluded that the “undisputed evidence in the record demonstrates that plaintiffs did not receive a discounted interest rate on the[ir] loan[s] as a quid pro quo for paying the loan discount fee[s].” Id. at_, 718 S.E.2d at 413. As a result, the court affirmed entry of summary judgment on plaintiffs’ loan discount claims. Id. at_,_, 718 S.E.2d at 412-13, 415. The court, however, reversed the trial court’s decision regarding the excessive fees claims, explaining that an issue of material fact remained about whether Title America, LLC actually overcharged for its services. Id. at_, 718 S.E.2d at 414-15. By doing so, the Court of Appeals implicitly recognized that section 75-1.1 provides a cause of action for excessive pricing. See id. at_, 718 S.E.2d at 414-15. Community Bank then sought discretionary review in this Court, which we allowed. Bumpers v. Cmty. Bank of N. Va., 366 N.C. 243, 731 S.E.2d 141 (2012).
Now we must decide whether the Court of Appeals erred by affirming the entry of summary judgment on plaintiffs’ loan discount claims and in recognizing a claim for excessive pricing. In making this determination we review the trial court’s order de novo to ascertain whether summary judgment was properly entered. Howerton v. Arai Helmet, Ltd., 358 N.C. 440, 470, 597 S.E.2d 674, 693 (2004) (citation omitted). “Summary judgment is appropriate ‘if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.’ ” Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012) (quoting N.C.G.S. § 1A-1, Rule 56(c) (2011)). Our review necessarily begins with an examination of our unfair and deceptive practices statute and applicable precedent.
Section 75-1.1 of our General Statutes states in pertinent part that “unfair or deceptive acts or practices in or affecting commerce [ ] are *88 declared unlawful.” N.C.G.S. § 75-1.1(a). This statute is broader and covers more than traditional common law proscriptions on tortious conduct, though fraud and deceit tend to be included within its ambit. See Marshall v. Miller, 302 N.C. 539, 543-44, 276 S.E.2d 397, 400 (1981). The statute does not, however, prohibit all wrongful conduct stemming from commercial transactions; section 75-1.1 does not, for example, apply to an individual who merely breaches a contract. Mitchell v. Linville, 148 N.C. App. 71, 74, 557 S.E.2d 620, 623 (2001) (“Neither an intentional breach of contract nor a breach of warranty . . . constitutes a violation of Chapter 75.” (citations omitted)).
The General Assembly has provided a means to enforce the mandate of section 75-1.1. Section 75-16 allows any individual who has been “injured by reason of any act or thing done by any other person, firm or corporation in violation of the provisions of this Chapter” to bring a civil action. N.C.G.S. § 75-16 (2011). “In order to establish a prima facie claim for unfair trade practices, a plaintiff must show: (1) [the] defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff.” Dalton v. Camp, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001) (citation omitted). For purposes of plaintiffs’ loan discount claims, the proximate cause element is at issue here.
Community Bank argues that, to establish proximate cause in a claim for misrepresentation under section 75-1.1, a plaintiff must show reliance on the allegedly misrepresented statement. Community Bank asserts that plaintiffs’ loan discount claims in this case are based on an alleged misrepresentation on which plaintiffs have failed to adequately establish their reliance. Community Bank argues that plaintiffs did not enter into their loan transactions because they believed they were receiving discounted loans, but instead decided to obtain their loans based on the total fees and the interest rates. As a result, Community Bank contends that summary judgment was entered improperly.
We agree with Community Bank that a claim under section 75-1.1 stemming from an alleged misrepresentation does indeed require a plaintiff to demonstrate reliance on the misrepresentation in order to show the necessary proximate cause. Such a requirement has been the law of this state for quite some time. See Pearce v. Am. Defender Life Ins. Co., 316 N.C. 461, 471, 343 S.E.2d 174, 180 (1986) (“It must be shown that the plaintiff suffered actual injury as a proximate result of defendant’s deceptive statement or misrepresentation.” *89 (citation omitted)). The Court of Appeals agreed with Community Bank on this contention as well, stating that when “ ‘an unfair or deceptive practice claim is based upon an alleged misrepresentation by the defendant, the plaintiff must show “actual reliance” on the alleged misrepresentation in order to establish that the alleged misrepresentation “proximately caused” the injury of which plaintiff complains.’ ” Bumpers,_N.C. App. at__, 718 S.E.2d at 413 (quoting Tucker v. Blvd,. at Piper Glen LLC, 150 N.C. App. 150, 154, 564 S.E.2d 248, 251 (2002)). But, after correctly citing the controlling rule, the Court of Appeals mischaracterized plaintiffs’ claims as based not on misrepresentations but as claims for systematic overcharging similar to those at issue in Sampson-Bladen Oil Co. v. Walters. Id. at_, 718 S.E.2d at 413. By doing so, the Court of Appeals erroneously distinguished overcharging from misrepresentation, finding proximate cause without considering whether plaintiffs presented sufficient evidence of reliance;
We disagree with the Court of Appeals’ interpretation of Sampson-Bladen Oil and the implication that there is no requirement for plaintiffs to demonstrate that they relied on the alleged misrepresentations. In Sampson-Bladen Oil a fuel oil supplier regularly, for a period of several years, overcharged one of its customers by misrepresenting the volume of oil that had been delivered. 86 N.C. App. 173, 177, 356 S.E.2d 805, 808, disc. rev. denied, 321 N.C. 121, 361 S.E.2d 597 (1987). The Court of Appeals held that such conduct amounted to a violation of section 75-1.1. Id. (stating “it seems plain to us, and we so hold, that systematically overcharging a customer for two years, as the jury found was done here in the amount of $2,795.30, is an unfair trade practice”). Yet, a claim for overcharging is not distinct from one based on misrepresentation. In Sampson-Bladen Oil the customer complained that the fuel oil supplier misrepresented in its bills how much oil was delivered and that the customer was damaged by making payments in reliance on those bills. See id. at 173-75, 356 S.E.2d at 806-07.
Reliance, in turn, demands evidence “showing] that the plaintiff suffered actual injury as a proximate result of defendant’s deceptive statement or misrepresentation.” Pearce, 316 N.C. at 471, 343 S.E.2d at 180. We previously likened such burden of proof to that of the “detrimental reliance requirement under a fraud claim.” Id. In making this inquiry we examine the mental state of the plaintiff. Two key elements specific to the plaintiff combine to determine detrimental reliance: (1) actual reliance and (2) reasonable reliance. See id. at *90 472, 343 S.E.2d at 181 (weighing the testimony of the plaintiff widow to decide if evidence supported claim of actual reliance by her husband); see also Forbis v. Neal, 361 N.C. 519, 527, 649 S.E.2d 382, 387 (2007) (“[A]ny reliance on the allegedly false representations must be reasonable.” (citation omitted)).
In the context of a misrepresentation claim brought under section 75-1.1, actual reliance requires that the plaintiff have affirmatively incorporated the alleged misrepresentation into his or her decision-making process: if it were not for the misrepresentation, the plaintiff would likely have avoided the injury altogether. See Hageman v. Twin City Chrysler-Plymouth Inc., 681 F. Supp. 303, 308 (M.D.N.C. 1988) (“[A] plaintiff must prove that he or she detrimentally relied on the defendant’s . . . misrepresentation.” (interpreting Pearce, 316 N.C. at 471, 343 S.E.2d at 180)); see also Tucker, 150 N.C. App. at 154, 564 S.E.2d at 251 (“[T]he plaintiff must show ‘actual reliance’ on the alleged misrepresentation in order to establish that the alleged misrepresentation ‘proximately caused’ the injury of which plaintiff complains.” (citation omitted)). The second element, reasonableness, is most succinctly defined in the negative: “Reliance is not reasonable where the plaintiff could have discovered the truth of the matter through reasonable diligence, but failed to investigate.” Sullivan v. Mebane Packaging Grp., Inc., 158 N.C. App. 19, 26, 581 S.E.2d 452, 458 (citations omitted), disc, rev. denied, 357 N.C. 511, 588 S.E.2d 473 (2003). Additionally, in cases concerning the existence of actual and reasonable reliance, “when there are genuine issues of material fact that are legitimately called into question, summary judgment should be denied and the issue preserved for the jury.” Howerton, 358 N.C. at 471, 597 S.E.2d at 694 (applying N.C.G.S. § 75-1.1 and finding a genuine issue of material fact regarding the plaintiff’s reliance on the defendant’s advertisements). Consequently, the Court of Appeals erred by not considering whether plaintiffs presented conclusive evidence of their actual and reasonable reliance on defendant’s alleged misrepresentations.
Further, Community Bank’s evidence raises another genuine issue about an entirely different material fact: whether plaintiffs actually received discounted loans. Because plaintiffs’ claims assert that they were injured when they paid for discounted loans they did not receive, the determination of whether they did, in fact, receive discounted loans is critical. This is a point on which there is conflicting evidence, giving rise to an issue of material fact.
Plaintiffs successfully argued to the trial court in support of their motion for partial summary judgment that Community Bank’s loan *91 transmittal documents, which had “no” checked under the heading “Buydown” and did not list a “Bought Down Rate,” established that they did not actually receive discounted loans. In response, former Community Bank Mortgage Operations Officer, John Grace, explained that the sections of the loan transmittal documents plaintiffs sought to use to establish they did not receive discounted loans do not actually stand for that proposition. While, as plaintiffs suggest, the loan transmittal documents do appear to indicate plaintiffs did not receive discounted loans, Mr. Grace’s statement draws that inference into question, creating a genuine issue of material fact. Thus, summary judgment on these loan discount claims was inappropriate.
Community Bank also contends that the Court of Appeals erred by holding that section 75-1.1 recognizes a claim for excessive pricing that would prohibit the fees plaintiffs paid for closing services. Community Bank asserts that nothing in the general language of section 75-1.1 reflects a legislative intent to place our trial courts in the position of price regulators. Further, Community Bank argues that by enacting a separate statute prohibiting certain businesses from charging “unreasonably excessive” prices during certain, specified events, the General Assembly intends not to regulate prices generally through section 75-1.1.
As we have observed, section 75-1.1 prohibits certain “unfair or deceptive” conduct. N.C.G.S. § 75-1.1. This Court has previously explained these terms. E.g., Walker v. Fleetwood Homes of N.C., Inc., 362 N.C. 63, 72, 653 S.E.2d 393, 399 (2007). “A practice is unfair when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers,” and a “practice is deceptive if it has the capacity or tendency to deceive.” Id. (citation and quotation marks omitted). Plaintiffs contend that charging closing fees roughly three times as high as the upper end of a range they find to be reasonable satisfies the “unfair or deceptive” requirement of a claim under section 75-1.1.
In most cases, there is nothing unfair or deceptive about freely entering a transaction on the open market. Indeed, in condemnation proceedings our legislature actually deems the “fair market value” of real property to be a just measurement of its value when compensating a property owner for its taking. N.C.G.S. § 136-112(2) (2011). The term market value has been defined as the actual sale price “by a seller willing but not obliged to sell, to a buyer willing but not obligated to buy.” N.C. State Highway Comm’n v. Helderman, 285 N.C. 645, 654, 207 S.E.2d 720, 727 (1974) (citation and quotation marks *92 omitted); see also 24 Samuel Williston & Richard A. Lord, A Treatise on the Law of Contracts § 64:4, at 50 (4th ed. 2002). As a result, when transacting parties willingly and honestly negotiate a transaction, generally the transaction is not said to be unfair or deceptive.
Our legislature has created an exception to this prevailing rule in section 75-38 of our General Statutes. In that section the General Assembly made it illegal and a violation of section 75-1.1 to engage in price gouging during an emergency or during an abnormal market disruption. N.C.G.S. § 75-38 (2011). When such an event occurs individuals may not “sell or rent or offer to sell or rent any goods or services which are consumed or used as a direct result of an emergency or which are consumed or used to preserve, protect, or sustain life, health, safety, or economic well-being of persons or their property with the knowledge and intent to charge a price that is unreasonably excessive under the circumstances.” Id. § 75-38(a). The legislature listed several factors that must be considered in determining “whether a price is unreasonably excessive,” including whether the “price charged by the seller is attributable to additional costs imposed by the seller’s supplier or other costs of providing the good or service during the triggering event.” Id. § 75-38(a)(l). This section’s prohibition on “unreasonably excessive” prices expires at the end of the “triggering event.” Id. § 75-38(c), (d). As a result, it seems our General Assembly has determined that when a buyer is under an extraordinary need on account of health, safety, or similar circumstances following an abnormal event, prices may become unlawfully excessive.
While there may be circumstances other than those described in section 75-38 when an unreasonably excessive price would constitute a violation of section 75-1.1, such circumstances are not present in this case. Plaintiffs entered into their loan transactions freely and without any compulsion. Bumpers obtained his loan to improve his financial condition, using its proceeds to retire existing debt with a higher interest rate and presumably to increase the value of another asset. Bumpers was informed and was aware that other closing agents existed and that those other agents might charge lower fees to close his loan from Community Bank. Nonetheless, Bumpers elected to close the transaction using Title America, LLC. Elliott was similarly aware of other lending and closing options and declined to use them. More to the point, while the record does indicate that the closing fees plaintiffs paid were higher than those charged by attorneys performing similar services at the time, the fees paid are not so high as to run afoul of section 75-1.1. Accordingly, it was error for the Court of Appeals to recognize these claims for excessive pricing.
*93 The Superior Court, Wake County, improperly entered summary judgment for plaintiffs on their loan discount claims and their excessive pricing claims. The Court of Appeals erroneously affirmed the entry of summary judgment on plaintiffs’ loan discount claims and, as a result, incorrectly remanded plaintiffs’ excessive pricing claims after finding an issue of material fact. Because genuine issues of material fact exist in regards to plaintiffs’ loan discount claims, and plaintiffs’ excessive pricing claims are not recognized by section 75-1.1, we reverse the decision of the Court of Appeals and remand this case to that court for further remand to the trial court for additional proceedings consistent with this opinion.
REVERSED AND REMANDED.

. Bumpers paid Community Bank a loan origination fee of $2,062.63, a loan discount fee of $1,280.25, an application fee of $95.00, and an underwriting fee of $185.00.

. Bumpers paid Title America, LLC a settlement or closing fee of $225.00, an abstract or title search fee of $120.00, a title examination fee of $300.00, an overnight fee of $25.00, a document review fee of $275.00, and a processing fee of $260.00.

. Elliott also paid Community Bank a $2,800.00 loan origination fee, a $95.00 application fee, and a $185.00 underwriting fee. Title America, LLC charged Elliott $225.00 for a settlement or closing fee, $120.00 for an abstract or title search, $300.00 for a title examination, $25.00 for an overnight fee, $250.00 for a document review fee, and $250.00 for a processing fee.

. This case has travelled some distance through the courts of both North Carolina and the United States. While we discuss the procedural history of the case to the extent necessary for a full understanding of the issues presented, it is decidedly more extensive than is set forth in the text here. See our earlier opinion, Bumpers v. Cmty. Bank of N. Va. (Bumpers I), 364 N.C. 195, 695 S.E.2d 442 (2010), for a more detailed discussion, and see the opinions of the United States Court of Appeals for the Third Circuit, In re Cmty. Bank of N. Va., 418 F.3d 277 (3d Cir. 2005), and In re Cmty. Bank of N. Va., 622 F.3d 275 (3d Cir. 2010), for additional background.

. Plaintiffs did not move for summary judgment on behalf of the class of those individuals similarly situated. The United States District Court for the Western District of Pennsylvania had previously entered an order barring plaintiffs from attempting to obtain certification of this case as a class action.

. The Court of Appeals initially dismissed Community Bank’s appeal as interlocutory because the trial court had not resolved the issue of attorney’s fees. Bumpers v. Cmty. Bank of N. Va., 196 N.C. App. 713, 675 S.E.2d 697 (2009). In Bumpers I we reversed that decision and remanded the case to the Court of Appeals for consideration of the merits of Community Bank’s appeal. 364 N.C. at 204-05, 695 S.E.2d at 448-49. We noted in our decision in Bumpers I that Elliott was not a participant in that appeal. Id. at 196 n.l, 695 S.E.2d at 443 n.l. Elliott has represented to this Court that his nonparticipation was the result of an order by the United States District Court for the Western District of Pennsylvania. Elliott’s involvement, however, is immaterial for purposes of our decision, and, given our disposition of this case, Elliott’s relationship to this case should crystalize upon remand.